

# NUMBER 13-22-00188-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MARCUS VILLARREAL III,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                  **Appellee.**

---

## On appeal from the 117th District Court
## of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña**
**Memorandum Opinion by Justice Silva**

Appellant Marcus Villarreal III was indicted on murder for the death of Robert Serrata, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02. At trial, his counsel advanced the theory that appellant shot Serrata in self-defense. *See id.* § 9.32. The jury rejected appellant's self-defense claim, convicted him of the lesser-included offense of

manslaughter, a second-degree felony, and the trial court assessed his punishment at fourteen years' imprisonment. *See id.* § 19.04. By one issue, appellant argues that the evidence was insufficient to support the jury's rejection of his self-defense claim. We affirm as modified.

## I.    BACKGROUND

On October 3, 2019, Romeo Jaso was sitting on a bus bench across a Walmart parking lot in Corpus Christi when he overheard someone yelling profanities. Jaso looked up to see a sixty-five-year-old man, later identified as Serrata, and a woman arguing across the street. At some unspecified point, Jaso noticed appellant, who was also situated across the street from Jaso, nearby Serrata. Serrata caught appellant staring at him and reportedly asked appellant, "[W]hat's the deal?" In response, appellant walked up to Serrata and punched him. "After [appellant] punched him, the old man staggered back and took off his cap and glasses," testified Jaso. "[Serrata] was about to hit [appellant], and [appellant] shot him." Appellant then walked away.

Three other witnesses also testified to the events that transpired immediately after Serrata was shot: Raymond Ysassi and Sara Rogers, Walmart employees, and Maria Flores, a bus driver. Ysassi testified that after he heard a gunshot, "[he] saw [appellant] with the gun in his hand, a cloud of smoke,[1] and [Serrata] f[a]ll to the floor." Appellant then walked away and appeared to "put a bag inside a vehicle." Ysassi stated appellant returned shortly thereafter but maintained a distance.

Rogers testified that she was seated right next to Ysassi, engaged in conversation

---

[1] CCPD firearm examiner Carolyn Martinez testified that the type of revolver used in the shooting usually emits more smoke than a pistol and described it as "fairly difficult to cock and fire."

with him, when he interrupted and said, "'[O]h, crap, gun,' or, ['H]e's got a gun.'" Rogers looked over and saw appellant standing "five or six feet" away from Serrata. "I saw the puff of smoke. I saw him walk over to his car," stated Rogers.

Flores testified she had just pulled up to the bus stop when she saw appellant walking away from a man lying on the ground, bleeding. Flores stated she radioed dispatch requesting an ambulance, exited the bus, and comforted Serrata's significant other until law enforcement arrived. Each witness testified that appellant did not at any point attempt to render aid.

David Saenz, Battalion Chief with the Corpus Christi Fire Department, was "around the corner" when he received a dispatch call reporting a shooting near the Walmart and arrived ahead of law enforcement. According to Saenz, individuals standing around Serrata's body identified appellant as the shooter. Appellant was seated underneath a tree nearby. Saenz testified, "And at that point I kind of—I make eye contact with [appellant]. I said, ['L]ook, I'm just here to check this guy. I don't want no trouble. Are we good?[']" Saenz further testified "there was blood everywhere," and so he was unable to ascertain the exact location of Serrata's entrance or exit wound. Former Nueces County Medical Examiner, Ray Fernandez, testified that Serrata's cause of death was a "gunshot wound to the neck."

Corpus Christi Police Department (CCPD) Officer Vicente Ortiz testified that appellant was cooperative throughout the investigation, handed over his gun to police, and admitted to shooting Serrata—maintaining that he had acted in self-defense. CCPD Detective Edward Alvarado testified that he was also told by appellant that he had acted

3

out of fear that Serrata was "going to assault him." No weapons were found on Serrata.

Appellant testified that on the day of the shooting, he had been living out of his car in the Walmart parking lot. His car battery had drained overnight, and he had planned to take the bus to an automotive parts store to recharge it. Appellant testified that he was walking over to the bus stop when he heard someone cursing at him: "It's getting louder and it's getting louder, like somebody is walking up behind me. So, I feared. I turned around and I see [Serrata] across the street under the tree on a shopping cart that has been turned sideways sitting down, looking at me, saying that." Appellant testified that he told Serrata, "What? What?" and Serrata stopped cursing but continued to stare at him. Appellant stated that he walked away from the bus stop in an effort to ignore Serrata.

After appellant saw the bus nearing, he made his way to the bus stop and heard Serrata cursing again. Appellant testified that he turned around to see Serrata walking towards him, reaching for his neck. Appellant stated he punched Serrata and jumped back. Serrata then took off his sunglasses and said, "*Te voy a desgraciar.*"[2] In response, appellant pulled out his gun, cocked it, and took off the safety, explaining:

> [T]he safety on my gun jams every single time, it takes a lot of strength to take the bullet, I m[e]an, to take the safety off. . . . So, I'm using all my strength, all my strength, and I took it off, but the gun jumped up. And when it jumped up, with my nerves and my tension, I grabbed it. And when I grabbed it, I pulled the trigger[,] and the gun went off by accident. And wow, the gun went off before I intended it to go off.

After shooting Serrata, appellant stated he walked back to his car to drop off the battery he had been carrying and then walked to "go get something to eat" and check what was showing at the theater. "I thought everything was fine," testified appellant, stating that he

---

[2] There was no direct translation provided at trial.

was unaware that the bullet had struck Serrata. Contrary to witness testimony, appellant testified he saw Serrata walk back to his girlfriend, and she was "laughing and giggling."

During cross-examination, appellant testified that he had been voluntarily homeless for approximately twenty-five years, working in various physically laborious industries over the years. Although first denying ever walking up to Serrata, appellant then acquiesced he had walked "[m]aybe five feet" towards Serrata. Appellant testified he saw no trail of blood in the images admitted at trial but opined that the video and photographs had been fabricated, with law enforcement using a mannequin in place of Serrata.

After both sides rested and closed, the trial court included the following self-defense instruction in the jury charge:

> Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.
>
> . . . .
>
> If you have found that the state has proved the offense beyond a reasonable doubt, you must also decide whether the state has proved that the defendant's conduct was not justified by self-defense.

The jury returned a guilty verdict for the lesser-included offense of manslaughter and this appeal followed.

## II.    SUFFICIENCY

By his sole issue, appellant challenges the sufficiency of the evidence to support the jury's rejection of his self-defense claim.

5

**A.    Standard of Review and Applicable Law**

The penal code provides that deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." *See id.* §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."), 9.31–.33 (setting forth substantive requirements for establishing claim of self-defense or defense of a third person); *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018). Texas Penal Code § 9.31 states that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). A "reasonable belief" in this context is defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using deadly force against another if he would be justified in using force under § 9.31 "when and to the degree the [person] reasonably believes the deadly force is immediately necessary . . . to protect [themselves] against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(2)(A); *Rogers v. State*, 664 S.W.3d 843, 851–52 (Tex. Crim. App. 2022) ("Section 9.31 lays out the standard for the use of force in self-defense. However, the use of deadly force in defense of a person is governed by [§] 9.32."). "The Penal Code does not require that a defendant intend the death of an attacker in order to be justified in using deadly force in self-defense." *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). However, the defendant bears the burden to produce evidence in support of his claim. *Braughton*, 569 S.W.3d at 608 ("The

6

defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."). "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Id.* (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)).

In determining the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19, (1979)); *see Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). Entwined in this analysis is a review of whether any rational trier of fact would have also "found against appellant on the self-defense issue beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 609. "We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Id.* at 608; *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This familiar standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 899 (providing that a reviewing court must not sit as "thirteenth juror," disagree with the jury's "weighing of the evidence,"

7

or "disagree with a jury's resolution of conflicting evidence"). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Braughton*, 569 S.W.3d at 608; *Brooks*, 323 S.W.3d at 922. "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (cleaned up).

## B.    Discussion

By finding appellant guilty of manslaughter, the jury necessarily rejected his proposed self-defense claim. *See Rogers*, 664 S.W.3d at 850, n.32; *Braughton*, 569 S.W.3d at 611; *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (providing assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"; "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory"). Moreover, the record does not indicate that the jury was irrational in rejecting the defense testimony that appellant relied on for his claim of self-defense.

By appellant's own admissions, he initiated physical force in response to verbal provocation. Subsequent to being assaulted by appellant, Serrata made a threatening comment, which appellant claims prompted him to draw and then inadvertently discharge his weapon. Believing he had not struck Serrata, appellant then returned to his car and left to check nearby movie times. Conversely, Jaso stated he saw appellant strike Serrata

unprovoked and then draw his weapon and shoot. According to multiple witnesses, it was evident Serrata had been shot because he was lying in a pool of his blood.

Although the jury heard two conflicting versions of the altercation, the jury was the sole judge of witness credibility on this issue, and we accept the jury's resolution of conflicts in favor of the verdict. *See Braughton*, 569 S.W.3d at 610 ("[I]t is apparent that appellant's defensive claims hinged almost entirely on the credibility of the witnesses who viewed the events. Given this fact, it would have been improper for the court of appeals to apply its own view of the weight and credibility of the witness testimony, thereby substituting its own view for that of the jury."); *Saxton*, 804 S.W.2d at 913. Thus, the evidence is sufficient to support the jury's rejection of appellant's self-defense claim. We overrule appellant's sole issue.

## III. MODIFICATION OF JUDGMENT

The judgment of conviction states that appellant's sentence was imposed on April 22, 2022. We modify the judgment to recite the correct date of appellant's sentence: April 25, 2022. *See Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (noting that we have the power to modify a judgment to speak the truth when we are presented with the necessary information to do so).

## IV. CONCLUSION

We affirm the trial court's judgment as modified.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

9

Delivered and filed on the
29th day of June, 2023.